S. B. TAYLOR AND JACOB LINCUMFELTER *v.* JAMES P. TAYLOR, Adm'r., AND BETSEY LINCUMFELTER.

COMPENSATION. *Services gratuitously rendered.* A person will not be allowed compensation for services, either in money or in a share of the property acquired, where the services were rendered gratuitously at the time; so held where a brother and sister had lived together nearly forty years, during which time the brother had accumulated property.

### FROM JEFFERSON.

Appeal from the Chancery Court at Dandridge.  H. C. SMITH, Ch.

SWAN for complainants.

O. C. KING for defendants.

COOPER, J., delivered the opinion of the court.

About the year 1828, John Lincumfelter, his sister Betsey and their mother, were living together on rented land.  The brother was an industrious, thrifty farmer and good trader, while the sister was an equally industrious, managing and thrifty housekeeper.  The mother died in a few years, and the brother and sister continued to live together until the death of the brother in 1860.  During the whole period the business was carried on exclusively by the brother, in his own name buying, selling, trading, and loaning money; the property bought, real and personal, being conveyed to him, and all obligations made to or by him.  At his death the estate, real and personal, seems to have

been estimated at about $10,000, the only land they owned being the farm on which they lived, and the residue of the assets consisting of the personalty on the the farm, and debts due. The heirs and next of kin of the intestate were his brother, the complainant Jacob Lincumfelter, and another sister, Polly Taylor, who died on the 17th of August, 1869, having made a will by which she devised her interest in her brother's estate to the complainant, Samuel B. Taylor. At the request of these heirs, the defendant, James P. Taylor, qualified as administrator of the estate of John Lincumfelter. It seems clear, that immediately upon the death of her brother, Betsey Lincumfelter set up a claim to one-half of the estate as having worked for it, and helped to make it, and counsel, employed by her, drew up a bill asserting her right to half the property on this ground, and to one-third of the residue as one of the heirs and next of kin of her brother. This bill was not filed at the time, being held up at her request upon the suggestion that matters might be amicably arranged between her and the other heirs, her brother and sister. And the parties did meet together at the house of Polly Taylor, in the presence of James P. Taylor, and other members of the family, at which meeting an inventory of the notes and other evidences of debts due the estate was made, and it was agreed that Betsey Lincumfelter should continue to occupy the farm, and have the personal property thereon, and the administrator should only collect the debts due, without meddling with anything on the farm. The complainants say that at

Taylor *v.* Lincumfelter.

this interview it was agreed that Betsey was to have the use of the farm for life, and the personalty on the farm absolutely, while the remaining assets were to be collected and divided equally between the brother and two sisters, each of whom was also to have one-third of the realty, subject to the life estate of Betsey. This is denied both by Betsey and James P. Taylor, who say that the agreement, as to the residue of the assets, was, that it was to be left to arbitrators to say how they should be divided. It is certain, however, that while the notes were being inventoried on this occasion, Betsey set up a claim to the note of one Larue, upon the ground that the money was hers for which it was given, and the other heirs agreed that it might be surrendered to her, which was done. James P. Taylor says that the agreement was to have been reduced to writing, which, however, was never done. Shortly afterwards, the precise date not appearing, Betsey and her brother entered into an agreement in writing, at her house, referring to the farm on which she lived as belonging to the estate of John Lincumfelter, and reciting that Betsey Lincumfelter and Jacob Lincumfelter agree that two disinterested persons should go upon the farm and value it at what they may think to be its true cash value, and Jacob Lincumfelter agrees, so far as he is concerned, Betsey is to have the land at this valuation. This agreement, signed by the parties, and attested, was left with a third person for safe keeping. The administrator having failed and refused to make any settlement, the original bill was filed on the 7th of

October, 1870, by Samuel B. Taylor and Jacob Lincumfelter against James P. Taylor, the administrator, and Betsey Lincumfelter, for an account of the administration, and for distribution of the personalty and partition of the realty of the estate of John Lincumfelter. On the 28th of October, 1870, Betsey Lincumfelter filed her answer and cross-bill, in which she renews her claim to one-half of the estate as a co-partner or co-owner with her deceased brother, or, if mistaken in her rights, to compensation for services rendered her brother in the accumulation of the estate.

The theory of the bill is not that there was any contract of partnership between John Lincumfelter and his sister Betsey, but that she contributed, by her labor, to the creation of the estate accumulated, and ought, for this reason, to have an interest in the property to the extent of one-half at least, either as a co-partner of her brother, or by way of resulting trust. "They were poor and penniless," says the cross-bill, "and by common consent went to work together jointly without any specific agreement as to what should be done with the fruits of their labor, each one striving in his particular sphere to add to the general stock." There is not a particle of proof in this voluminous record of over five hundred pages that the complainant in the cross-bill ever, at any time during the lifetime of her brother, made the least claim to any portion of the property or its profits held and managed as his own by John Lincumfelter. The great mass of testimony is, that the property was considered by John Lincumfelter himself, and by every other per-

son, Betsey inclusive, as belonging to him alone, and was so treated accordingly. To change the ownership of the property after his death, by mere proof of having contributed to its production and accumulation, without any agreement on the subject, would find no warrant in reason or authority, and could not be entertained for a moment.

Reliance is, however, placed on the testimony of six or eight witnesses, who, during the period of about forty years the brother and sister lived together, depose to isolated conversations held with the brother at different times and at long intervals, in which he seems to recognize his sister's interest in the property. One witness, whose testimony is perhaps as strong as any, says: "I never heard them (the brother and sister) talking together, but I have heard him talk. He told me on two occasions how they had lived together. He said they had been housekeeping together about forty years, and working to each other's hands, and if they made anything it was to be divided equally between them, and whichever outlived the other was to have the property while they lived, and at the death of both, if there was anything left of his part, he wanted it to go to his children"—meaning two illegitimate children of his then living with him and his sister. Another witness, however, who deposes to a similar conversation, thus words it: "He said he intended the property they had, if she outlived him, to go to Betsey, and then to the children they were raising." One witness understood him to say, "Half of it was hers anyhow." Another, "that them that was helping

to make it should have it." While a third reports the words, "whichever outlived the other was to have all." Four other witnesses think they heard him say that he and Betsey were partners, while a fifth witness, although repeating the same words, admits that they were not the identical language, but only the impression made upon him by the language used. If, now, the claim was that there had been a contract of partnership, these utterances might deserve grave consideration as tending to establish such an issue. But, in absence of such claim, they only indicate a general intent upon his part to make such a disposition of his property as to secure it to his sister, whose lifelong association and services he must have fully appreciated, and to his illegitimate children, who were, properly, objects of his affection and bounty. If the property were in fact his, an assertion that his sister was a co-partner would be without consideration, and not binding as a contract, and amount to nothing more than an extreme expression of his appreciation of the value to him of her association. It is impossible to allow the rights of parties to property to turn, in a court of justice, upon such casual and informal conversations, not designed at the time to fix or establish those rights. And it may be said of the claim to an interest in the property on the score of services without contract, as of the claim in the alternative, for compensation in money, that nothing is better settled in the law, or has a sounder foundation in good sense, than that a person will not be allowed to demand compensation for services which were rendered gratui-

tously at the time. *Wells* v. *Caldwell,* 9 Hum., 607; *Bartholomew* v. *Jackson,* 20 Johns, 28; *Force* v. *Haines,* 2 Harrison, 385; *White* v. *Jones,* 14 La. An., 681; *Little* v. *Dawson,* 4 Dall., 111; *Davison* v. *Davison,* 2 Beas., 246; Bish. on Cont., sec. 76. And the presumption of a contract to pay for services will not, ordinarily arise between near relations. *Harris* v. *Currier,* 44 Vt., 468; *Hertzog* v. *Hertzog,* 5 Casey, 465; *Hayes* v. *McConnell,* 42 Ind., 285; Bish. on Cont., sec. 77. It may safely be said that the sister, like the illegitimate children of the intestate, trusted entirely to the sense of right of the brother. It was the misfortune of both that the deceased came to his death suddenly by accident, without the opportunity of effectuating his intentions in their behalf. The cross-bill must be dismissed with costs.

The complainants concede in the original bill that it was agreed by Jacob Lincumfelter and Polly Taylor that their sister Betsey should have the farm for life, and the personal property on it absolutely. These were just concessions on their part, highly honorable to them under the circumstances, even in the absence of contract. But I think the weight of evidence is that there was an agreement at the time, that, in consideration of these concessions, the residue of the estate should be divided between the parties, the debts when collected, the lands at the death of Betsey, which event has happened. And although the agreement may not have all the requirements of a valid contract, the complainants affirm in their bill their willingness to

execute it. The rights of the parties may be declared accordingly, and a decree made for distribution and partition.

The revival of the claim of the cross-bill was an after thought, due more to the administrator than to his aunt Betsey. He has, confessedly, been using the money of the estate by an ostensible payment to her under her revived claim, and a borrowing from her. He will be held to the usual administrative account, except of the personalty on the farm and the Larue note, and, having failed to make any settlement of the administration before bill filed, he will be allowed no compensation, will be charged with interest, and will pay the costs of taking the account. The residue of the costs under the original bill will be paid out of the estate, or equally by the three parties entitled.

The decree below will be reversed, and a decree entered in accordance with this opinion.